IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

|  |  |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | RECEIVED 2015 JUL 27  A 11: 49 |
| Plaintiff, | CIVIL ACTION NO. DEBRA P. HACKETT, CLK U.S. DISTRICT COURT MIDDLE DISTRICT ALA |
| v. | 1:15-CV-538-MHT-TFM |
| DINAR, CORP., INC.; MY MONEX, INC., a Nevada Corporation; and HUSAM TAYEH | FILED UNDER SEAL |
| Defendants, |  |
| THEODORE S. HUDSON, II; and MY MONEX, INC., an Alabama Corporation |  |
| Relief Defendants. |  |

## PLAINTIFF'S *EX PARTE* MOTION FOR STATUTORY RESTRAINING ORDER

Plaintiff U.S. Commodity Futures Trading Commission (the "Commission") hereby

moves, pursuant to Section 6c of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 13a-1

(2012), for emergency injunctive relief against Defendants Husam Tayeh ("Tayeh"), Dinar

Corp., Inc., a Nevada corporation ("DCI"), and My Monex, Inc., a Nevada corporation ("Monex

NV") (collectively "Defendants"), and Relief Defendants Theodore S. Hudson, II ("Hudson")

and My Monex, Inc., an Alabama corporation ("Monex AL") (collectively "Relief Defendants").

As shown below and alleged in the Commission's contemporaneously filed Complaint For

Permanent Injunction, Civil Monetary Penalties, and Other Equitable Relief ("Complaint") (ECF

No. 1), Defendants have engaged, are engaging, and may be about to engage in acts and practices

that violate the anti-fraud and registration provisions of the Act and Commission Regulations.

The issuance of an *ex parte* statutory restraining order ("SRO") freezing assets and

preventing destruction of records is critical in this case. Given the pervasiveness of their fraud,

1

the fact that Defendants remain in possession of the fruits of their fraud, and that the Relief

Defendants continue to transfer customer funds on behalf of Defendants, court action is required

to stop Defendants and Relief Defendants from further dissipating funds and to ensure that they

do not defeat the Court's ability to order disgorgement. *See CFTC v. Muller*, 570 F.2d 1296,

1300-01 (5th Cir. 1978). Similarly, the ease of destroying documents supports an order

prohibiting Defendants and Relief Defendants from destroying records, including electronically

stored information ("ESI"), and granting the Commission immediate access to Defendants' and

Relief Defendants' records. Preservation of such records will provide a meaningful opportunity

to identify other potential victims of Defendants' fraud and to identify and account for all of

Defendants' and Relief Defendants' assets. A proposed order is being submitted with this

motion.

## I.   STATEMENT OF FACTS

### A. The Fraudulent Scheme

From at least January 2012 and continuing to the present (the "relevant period"),

Defendants engaged, and are engaging, in a fraudulent scheme involving the offering of financed

retail foreign currency ("forex") transactions to retail customers who are not eligible contract

participants ("ECPs"). Defendants solicited retail customers through their website,

*www.dinarcorp.com* (the "website'), to engage in financed retail forex transaction. Although

Defendants offer forex on a fully paid basis, the vast majority of its business is in financed forex

transactions, in "layaway plans" or installment payments of fifteen, forty-five, sixty, ninety or

one hundred-twenty days. The Commission's Complaint and this motion relates to the financed

forex transactions of Defendants, who have never been registered as required with the

Commission, and have engaged in more than $27 million of these illegal, financed retail forex

transactions in Vietnamese Dong and Iraqi Dinar. *See* Exhibit 2, Declaration of P. Gomersall,

2

Futures Trading Investigator at ¶¶ 16-21; Exhibit 1, Declaration of K. Koh, Futures Trading Investigator at ¶ 4. After a customer agrees to enter into a forex transaction with Defendants, the customer is advised via a confirming email containing an order number, to send their initial "nonrefundable" payment to Defendants via money order or cashier's check, and they are to make their funds payable to "My Monex, Inc." *See* Exhibit 1 at ¶ 4; Exhibit 19, Exemplars of Transaction Confirmation Emails from Defendants to Customers.[1]

Upon receipt of the money orders and cashier's checks that comprise customers' installment payments, Defendants mail them to the Relief Defendants in Dothan, Alabama, where the funds are deposited into bank accounts opened by Hudson and carried in the name of Monex AL. *See* Exhibit 2 at ¶¶ 6-12. As soon as customers' funds clear within the Relief Defendants' bank accounts, the funds are sent by the Relief Defendants back to the Defendants, or entities and/or persons associated with the Defendants, less a five percent "processing fee" retained by the Relief Defendants. *See* Exhibit 1 at ¶ 21. Tens of thousands of customer orders have been deposited into these accounts during the relevant period. *Id.* Indeed, the volume of these transactions became so alarming that one bank put a hold on the account and filed an interpleader action in the Circuit Court for Houston County, Alabama. *See* Exhibit 20, *Five Star Credit Union v. Theodore Hudson, et al.*, Circuit Court for Houston County, Alabama, Case No. CV-2014-900007, filings and pleadings.[2]

In furtherance of the fraudulent scheme, Defendants falsely represent to actual and prospective customers via the website that DCI is a "Licensed Money Services Business…fully

---

[1] The website only mentions "Dinar Corp. Inc." and makes no mention of either Tayeh or Monex NV. The only time any entity other than DCI is noted as being associated with the subject transaction(s) is upon receipt of the confirming email from the Defendants.

[2] In the Defendants' Joint Motion for Summary Judgment, Section I, ¶ "B," Tayeh, Hudson, Monex Al and Monex NV each admit that Monex NV receives money orders, wire transfers and cashier's checks for a business they describe as "internet sales of various collectible products in the normal course of [Monex NV's] business operations pursuant to its Nevada business license." *Id.*

registered and fully compliant." *See* Exhibit 23, selected pages from *www.dinarcorp.com*. This representation is false: DCI is not currently registered with the United States Department of the Treasury, Financial Crimes Enforcement ("FINCEN") in any capacity. *See* Exhibit 1 at ¶ 21. In addition, Defendants are barred from conducting business as a "money services business" in Texas and Illinois for failing to comply with the relevant laws of those states.[3] *See* Exhibit 21, State of Texas Cease and Desist Order; Exhibit 22, State of Illinois Cease and Desist Order. Moreover, Defendants fail to advise customers that they have never been registered with the Commission as required by federal law. *See* Exhibit 24. Further, through the website, Defendants falsely represent that DCI has the "[B]est Prices Guaranteed…no special codes, no secret discount, just best prices up front all the time." *Id.* Defendants fail to advise customers of material facts regarding the true cost of the financed retail forex transactions offered by the Defendants, including but not limited to, that the transactions include an undisclosed finance charge of up to twenty-two (22%) percent of the overall cost of each transaction. *See* Exhibit 1, at ¶ 4.

### B. Failure to Register with Commission

During the relevant period, DCI and Monex NV acts as RFEDs in that they solicit and accept orders from customers who are not ECPs to enter into agreements, contracts or transactions in forex, which are financed by the Defendants. *See* Exhibit 23; Exhibit 1 at ¶¶ 18-20. Neither DCI nor Monex NV has ever been registered in any capacity with the Commission. *See* Exhibit 24. Accordingly, during the relevant period, DCI and Monex NV unlawfully failed to register with the Commission as RFEDs, in violation of Commission Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(i).

---

[3] Monex NV registered FINCEN on April 25, 2014 as a "check casher" money services business . *See* Exhibit 28, FINCEN registration of Monex NV.

Further, throughout the relevant period, Tayeh is and has been the sole officer of both DCI and Monex NV. *See* Exhibit 1 at ¶ 9; Exhibit 3, Verified Third Amended Complaint of Tayeh, *Dinar Corp, Inc., et al. v. Sterling Currency Group, LLC, et al.*, Case No.: 1:14-cv-00714-AT, (N.D. Ga.).  Therefore, he has been an AP of both DCI and Monex NV because he is a partner, officer or employee, acting in a capacity that involves the solicitation or acceptance of retail forex customers' orders, or the supervision of any person or persons so engaged, without benefit of registration, in violation of Commission Regulation 5.3(a)(6)(ii), 17 C.F.R. § 5.3(a)(6)(ii).

**C. Relief Defendants Received Funds To Which They Have No Legitimate Claim**

Throughout the relevant period, Defendants have sent millions of dollars of customers' cashier's checks and/or money orders to Hudson at his home in Dothan, Alabama. *See* Exhibit 3 at ¶¶ 6-12, 16-21.  Upon receipt of customer funds from the Defendants, Hudson deposits the funds in bank accounts he opened in the name of Monex AL at various banks in Dothan, Alabama. *See* Exhibit 1 at ¶ 21; Exhibit 3 at ¶¶ 5-12.  Hudson is a signatory on each such account. *See* Exhibit 3 at ¶¶ 5-12.  The relevant bank records show that Hudson retains a percentage of these funds as purported "processing fees," generally through transfers he makes to business entities that he controls, such as Hudson Global Investments and Monex AL. *Id.* at ¶¶ 6-13, 17.  Hudson and Monex AL have no legitimate claim to the customer funds they hold, or the "processing fees" they have collected, all of which were obtained as a result of the Defendants' fraudulent conduct.

5

## II.     **ARGUMENT**

### A. The Court Has Jurisdiction and Authority to Grant the Relief Sought

Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), authorizes the Commission to seek certain limited injunctive relief in a district court on an *ex parte* basis against any person whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

The operative language of Section 6c(a) of the Act, 7 U.S.C. § 13c(a)(1) (2012) provides, in relevant part, as follows:

> Whenever it shall appear to the Commission that any... person... has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation or order thereunder... the Commission may bring an action in the proper district court of the United States...to enjoin such act or practice...and said courts shall have jurisdiction to entertain such action: *Provided, however, that no restraining order (other than a restraining order which prohibits any person from destroying, altering, or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate) or injunction for violation of the provisions of this Act shall be issued ex parte by said court.*

*Id.* (Emphasis added.)

The operative language of the statute sets forth both a general prohibition against *ex parte* relief, as well as further provides for certain enumerated exceptions to that general prohibition. Relevant and applicable case law directs that "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Hillman v. Maretta*, 133 S. Ct. 1943, *1953 (2013), quoting Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) (*citation omitted*).

6

As explained below, the limited *ex parte* restraining order sought by the Commission in this application fits within the scope of the enumerated exceptions set forth in the statute.[4]

### a. The proposed restraining order prohibits Defendants from destroying, altering or disposing of, any books records or other documents

This provision in the proposed restraining order is explicitly authorized by the terms of Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012) ("[N]o restraining order []*other than a restraining order which prohibits any person from destroying, altering, or disposing of... any books and records or other documents...* shall be issued ex parte by said court.") (Emphasis added).

### b. The proposed restraining order prohibits Defendants from refusing to permit authorized representatives of the Commission to inspect and copy books, records, documents, including ESI

Other operative language in Section 6c(a), 7 U.S.C § 13a-1(a) (2012), authorizes this Court to issue an *ex parte* restraining order that "prohibits any person from... refusing to permit authorized representatives of the Commission to inspect, *when and as requested, any* books and records or other documents..." This language, and in particular the phrases "when and as requested," and "any," confer broad authority on the Court to issue an *ex parte* order to ensure that Commission representatives have unfettered access to all potentially relevant documents.

In light of the voluminous nature of ESI, as well as the ease with which such evidence can be destroyed, the twin goals set forth in the statute of 1) preventing possible destruction of evidence, and 2) ensuring that Commission representatives have full access to all such evidence,

---

[4] Of course, other provisions of this same section of the Act, as well as other relevant and controlling case law, provide this Court with broad authority to grant the full range of equitable relief requested in the Commission's complaint, as well as to impose the requested civil monetary penalties, after service of the Complaint, Summons, and any restraining order. *See, e.g.* Sections 6c(c) and (d) of the Act, 7 U.S.C. §§ 13a-1(c), (d) (2012) and *Porter v. Warner Holding Co.*, 328 U.S. 395, 198 (1946) ("Unless otherwise provided by statute, all inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.") The Commission will immediately seek such broader equitable relief through a Motion for Preliminary Injunction that the Commission has filed separately and served with the Complaint, and any restraining order this Court may grant as requested herein, upon the Defendants.

can *only* be achieved through a court order that allows the Commission to *copy* all documents, both paper and electronic. It is extremely common, and indeed almost certain, that most, if not all of the "books and records and other documents" in Defendants' possession will be stored electronically. Due to the intricate, and sometimes sophisticated and covert ways that ESI can be organized, stored, and sometimes hidden or encrypted, the only possible way to ensure that Commission representatives can "inspect" such "documents," and to prevent Defendants from "disposing" or "destroy[ing]" such evidence, is to authorize Commission representatives to obtain copies of all documents, both paper and electronic.[5]

Indeed, the legislative history of Section 6c of the Act underscores the importance that Congress attached to providing courts with authority to issue *ex parte* orders to prevent any possible destruction of records or dissipation of customer funds. Mindful that notice "may result in the destruction of books and records and the dissipation of customer funds," Congress authorized courts to issue such relief *ex parte* in order "to prevent possible removal or destruction of potential evidence or other impediments to legitimate law enforcement activities and to prohibit movement or disposal of funds, assets and other property which may be subject to lawful claims of customers." H.R. Rep. No. 97-565, at 53-54, 93 (1982), reprinted in 1982 U.S.C.C.A.N. 3871, 3902-03, 3942.

The Court has authority to grant the requested relief to obtain copies of Defendants' electronic and paper records, based on the strong policy, enunciated by Congress, "to prevent any possible destruction of records." *Id.* This relief is also a legitimate means of vindicating the Court's authority to issue an order that will ensure Commission representatives have a real and meaningful opportunity to inspect, review, and analyze all potentially relevant documents. Given the ease with which ESI can be spoliated or destroyed, and in light of the evidence of

---

[5] After execution of any restraining order, and after Defendants have complied fully with same, the Commission will develop and disclose a proposed protocol for the appropriate handling of any potentially privileged documents.

Defendants' deliberate disregard for the law, such relief is not only prudent and reasonable, but essential. The requested relief is even more appropriate in this case, given that the Defendants are not registered with the Commission and therefore are under no regulatory obligation to maintain records that are likely material to determining the full extent of the Defendants' violative conduct.

### c. The proposed restraining order prohibits Defendants from withdrawing, transferring, or dissipating any funds, assets or other property

This requested relief is also explicitly authorized by Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a) (2012), which provides that "[N]o restraining order, []other than a restraining order which.... *Prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property... shall be issued ex parte by said court."* (Emphasis added.)

### d. The proposed restraining order does not require the Commission to post a bond:

This provision is explicitly authorized by subsection 6c(b) of the Act, 7 U.S.C. § 13a-1(b) (2012), which provides that "upon a proper showing, a permanent *or temporary injunction or restraining order shall be granted without bond."* (Emphasis added.)

### e. The Relief Sought is Necessary and Appropriate to Preserve the Court's Authority to Provide Complete Equitable Relief

The Court has equitable authority to grant the requested *ex parte* relief restraining Defendants from further dissipating assets so as to preserve the *status quo* and to preserve the Court's authority to provide for complete equitable relief. *See CFTC v. Muller*, 570 F.2d 1296, 1301 (5th Cir. 1978) ("[The] temporary freeze of defendant's assets was reasonably necessary to assure that the court's jurisdiction would not be defeated by the defendant's disposition of assets in the event the court should ultimately order disgorgement of the allegedly misappropriated

9

funds."). A restraining order of this nature is especially appropriate where, as here, the CFTC seeks disgorgement and restitution. *See CFTC v. Levy*, 541 F.3d 1102, 1114 (11th Cir. 2008) ("[A] district court may freeze a defendant's assets to ensure the adequacy of a disgorgement remedy"). As a sister district court explained: "[m]oreover, an order imposing a temporary freeze of assets is often necessary simply to preserve the *status quo* while an investigation is conducted to clarify the sources of various funds." *CFTC v. Morgan, Harris & Scott, Ltd.*, 484 F. Supp. 669, 678 (S.D.N.Y. 1979).

**B.    The Commission has Jurisdiction Over Defendants' Financed Retail Forex Transactions**

Section 2(c)(2)(C) of the Act applies to off-exchange forex transactions. That jurisdictional provision applies to any agreement, contract or transaction in foreign currency that is offered or entered into with a non-eligible contract participant ("non-ECP") on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis. 7 U.S.C. § 2(c)(2)(C)(i). Section 2(c)(2)(C) of the Act further provides that such agreement, contract or transaction shall be subject to Section 4b of the Act "as if the agreement, contract or transaction were a contract of sale of a commodity for future delivery." 7 U.S.C. § 2(c)(2)(C)(iv). Commission Regulation 5.25 further provides that Section 4b of the Act, among others, "shall apply to retail forex transactions" that are subject to the requirements of Part 5 of the Commission's regulations. 17 C.F.R. § 5.25.

Section 2(c)(2)(C)(i)(II) of the Act excepts certain transactions from Section 2(c)(2)(C), none of which are applicable here. Section 2(c)(2)(C)(i)(II) excepts a security that is not a security futures product, and a contract of sale that (1) results in "actual delivery within 2 days;" or (2) creates an enforceable obligation to deliver between a seller and a buyer that have the ability to deliver and accept delivery, respectively, "in connection with their line of business." 7

10

U.S.C. § 2(c)(2)(C)(II)(aa), (bb).  Section (2)(c)(2)(C) also does not apply to transactions where the counterparty, or the person offering to be the counterparty, is one of the enumerated persons described in Section 2(c)(2)(B)(i)(II) of the Act.  *See* 7 U.S.C. § 2(c)(2)(C)(i)(I).

Defendants offer financed retail forex transactions to, and enter into such transactions with, persons who are non-ECPs.  Generally, Defendants' customers are unsophisticated, individual investors who do not meet the $10,000,000 discretionary investment threshold to be considered ECPs.[6]  The Defendants fail to ask for any information from actual or prospective customers concerning their total assets, or whether customers are entering into the transactions to managing existing risk.  *See* Exhibit 1at ¶¶ 15-16.  Based upon the Defendants' solicitation, and the pattern of thousands of small money orders and cashier's checks typical of retail customers, the evidence demonstrates that the Defendants engage in financed retail forex transactions with customers who are non-ECPs.

Defendants offer and enter into such transactions on a margined or leveraged basis, or financed by Defendants, that settle over periods ranging from fifteen to one hundred-twenty days; none of the transactions at issue are spot forex transactions.  In the context of forex, spot transactions typically settle within two business days after the transaction date ("T+2"); this accepted market practice of a two-day settlement for spot foreign currency transactions has been recognized by the Commission and the courts.  *See Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps' Security-Based Swap Agreement Recordkeeping*, 77 FR 48208-01, 48257 (Aug. 13, 2012)("In general, a foreign exchange transaction will be considered a bona fide spot transaction if it settles via actual

---

[6] The Act defines an ECP, in relevant part, as an individual with total assets in excess of (i) $10,000,000, or (ii) $5,000,000 and who enters the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual." *See* 7 U.S.C. § 1a(18)(A)(xi).

delivery of the relevant currencies within two business days"). *See also CFTC v. Frankwell Bullion, Ltd.*, 99 F.3d 299, 300 (9th Cir. 1996) ("Spot transactions in foreign currencies call for settlement within two days."); *CFTC v. Int'l Fin. Servs. (New York), Inc.*, 323 F. Supp. 2d 482, 495 (S.D.N.Y. 2004) (noting that spot transactions ordinarily call for settlement within two days. Here, there are no spot forex transactions because the transactions at issue are settled in fifteen, forty-five, sixty, ninety and/or one hundred-twenty days after the date of the transactions, not within two days.

The retail forex transaction(s) at issue are financed by the Defendants, acting as the counterparty to the transaction(s). *See* Exhibit 1 at ¶ 13. The "layaway plan" or installment payments offered by the Defendants as part of each forex transaction offered to customers contains the indicia of financed transactions, including payments over time and an undisclosed financing charge that exceeds by more than twenty-two percent (22%) the value of the fixed exchange rate of the Dinar versus the U.S. Dollar as set by the Central Bank of Iraq. *Id.*

A court's first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning; the inquiry must cease if the statutory language is unambiguous and "the statutory scheme is coherent and consistent." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240, 109 S. Ct. 1026, 1030, 103 L.Ed.2d 290 (1989); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–254, 112 S. Ct. 1146, 1149–1150, 117 L.Ed.2d 391 (1992). The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole. *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477, 112 S.Ct. 2589, 2594–2595, 120 L.Ed.2d 379 (1992); *McCarthy v. Bronson*, 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991). Section 2(c)(2)(C) of the Act is clear and

unambiguous on its face, including the clear and unambiguous language referring to the need

that the forex transactions be entered into on a "leveraged or margined basis, or financed by the

offeror, or the counterparty..." Here the Defendants act as the counterparty to each retail forex

transaction, that are financed by the Defendants through their use of installment payments which

over the life of the transaction charge more than twenty-two percent of the true cost of the

transaction. *See Black's Law Dictionary* 747 (10th ed. 2014) (defining "finance charge" as "[a]n

additional payment...paid by a retail buyer for the privilege of purchasing goods or services in

installments."). Finding the subject transactions to be financed conforms to the plain and

unambiguous language of Section 2(c)(2)(C) of the Act, and effects the remedial purposes of the

Act, which is to be liberally construed by the courts. *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d

1321, 1329 (11th Cir. 2002) (citations omitted).

None of the transactions at issue involve a security futures product, and none of the

Defendants are one of the enumerated persons described in Section 2(c)(2)(B)(i)(II) of the Act:

United States financial institutions,[7] registered brokers or dealers (and their associated persons),

futures commission merchants (and their associated persons), financial holding companies; and

retail foreign exchange dealers. Finally, as these transactions are made with retail customers,

generally none of the buyers are entering into the transactions in connection with their line of

business. Therefore, Defendants' transactions are not excepted from the Commission's

jurisdiction under Section 2(c)(2)(C)(II)(aa) and (bb) of the Act. Accordingly, Defendants'

---

[7] A "financial institution" is defined in 7 U.S.C. § 1a(21) (2012), in pertinent part, as: "(A) a corporation operating under the fifth undesignated paragraph of section 25 of the Federal Reserve Act (12 U.S.C. 603), commonly known as an agreement corporation'; (B) a corporation organized under Section 25A of the Federal Reserve Act (12 U.S.C. 611 et seq.), commonly known as an 'Edge Act corporation'; (C) an institution that is regulated by the Farm Credit Administration; (D) a Federal credit union or State credit union; (E) a depository institution (as defined in section 3 of the Federal Deposit Insurance Act; (F) a foreign bank or a branch or agency of a foreign bank: (G) any financial holding company; (H) a trust company; or (I) a similarly regulated subsidiary or affiliate of an entity described above. The Defendants fail to meet any of the above requirements to qualify as a United States "financial institution."

financed retail forex transactions fall squarely within the Commission's jurisdiction under

Section 2(c)(2)(C) of the Act.

### C.   Defendants Violated Section 4b(a)(2)(A) and (C) of the Act and Regulation 5.2(b)(1) and (3)

Section 4b(a)(2)(A) and (C) of the Act makes it unlawful for any person, in or in

connection with any order to make, or the making of, any contract of sale of any commodity for

future delivery, that is made, or to be made, for or on behalf of , or with, any other person, other

than on or subject to the rules of a designated contract market - (A) to cheat or defraud or attempt

to cheat or defraud another person, or (C) willfully to deceive or attempt to deceive the other

person by any means whatsoever in regard to any order or contract or the disposition or

execution of any order or contract.  7 U.S.C. § 6b(a)(2)(A), (C).  Commission Regulation

5.2(b)(1) and (3), 17 C.F.R. § 5.2(b)(1), (3) (2014), mirrors the requirements of Section

4b(a)(2)(A) and (C) of the Act.  Pursuant to Section 2(c)(2)(C)(ii)(I) of the Act, 7 U.S.C.

§ 2(c)(2)(C)(ii)(I), and Commission Regulation 5.25, 17 C.F.R. § 5.25, the financed retail forex

transactions at issue herein are specifically made subject to Section 4b of the Act.

To establish that the Defendants violated Section 4b(a)(2)(A) and (C) of the Act and

Commission Regulation 5.2(b)(1) and (3) through fraudulent solicitations, the Commission must

prove that:  (1) defendants made a misrepresentation, misleading statement, or deceptive

omission; (2) with scienter; and (3) that the misrepresentation, misleading statement, or

deceptive omission was material.  *R.J. Fitzgerald & Co.*, 310 F.3d at 1328 (11th Cir. 2002).

Scienter requires proof that the defendant committed the alleged wrongful acts "intentionally or

with reckless disregard for his duties under the Act." *Drexel Burnham Lambert, Inc. v. CFTC*,

850 F.2d 742, 748 (D.C. Cir. 1988); *see also R.J. Fitzgerald*, 310 F.3d at 1328-30 ("[S]cienter is

established if Defendant intended to defraud, manipulate, or deceive, or if Defendant's conduct

14

represents an extreme departure from the standards of ordinary care."). A statement or omission is material if "a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald*, 310 F.3d at 1328.

Tayeh, individually and on behalf of DCI and Monex NV, makes misrepresentations knowingly or with reckless disregard of the truth, and knowingly or with reckless disregard of the truth omits information, in order to induce customers to engage in financed retail forex transactions with the Defendants. These misrepresentations and omissions are material because a reasonable customer would want to know, among other things, that the Defendants are not registered with the Commission as required by federal law, that they are thereby operating an illegal business operation, that they had been ordered to cease their business activities in a least two states, and that there is an undisclosed finance charge attached to each transaction.

### D. Registration Violations

On October 18, 2010, the Commission enacted new regulations implementing certain provisions of the Act, as amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010), §§701-774, 124 Stat. 1376 (enacted July 21, 2010), and the Food, Conservation, and Energy Act of 2008 Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act of 2008("CRA")), §§13101-13204, 122 Stat. 1651 (enacted June 18, 2008), to be codified at 7 U.S.C. §§1 et seq., with respect to off-exchange financed retail forex transactions. For purposes of retail forex transactions, the new regulations, among other things, require RFEDs and APs of RFEDs to register with the Commission.

The Commission's registration requirements for commodity professionals are a cornerstone of the regulatory framework enacted by Congress to protect the public. Registration

is the linchpin of the Commission's ability to perform its statutory functions of monitoring and enforcing the Act." *In re Forex Capital Markets, Ltd.*, [2010-2011 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶33,186 (CFTC Aug, 3, 2011).   The Commission has recognized that the operation of an unregistered entity is a serious violation of the Act and a threat to the integrity of the industry. Registration is the kingpin in this statutory machinery, giving the Commission the information about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the Act. *See CFTC v. British American Commodity Options Corp.*, 560 F.2d 135, 139-140 (2d Cir. 1977), *cert. denied*, 438 U.S. 905 (1978). Thus, failure to register with the Commission is a serious offense, and not a mere technical violation of the Act. *See CFTC v. Heritage Capital Advisory Services., Ltd.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶21,627 at 26,387 (N.D. Ill. Nov. 8, 1982). Thus, the Defendants' failure to register with the Commission is a serious offense, and not a mere technical violation of the Act. *Id.*

**1.      The Defendants Violated Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended by the CRA**

The Defendants, though their website, solicit non-ECPs to enter into financed retail forex transactions, while acting as the counterparty to the transactions, in violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended, 7 U.S.C. §2(c)(2)(C)(iii)(I)(aa) (2012).  As discussed *supra*, none of the Defendants are a person described in (aa), (bb), (dd), or (ff) of subparagraph (B)(i)(II).  Because the Defendants are not registered in an appropriate capacity (i.e., as an RFED or AP of an RFED) when they solicit customers, they have violated Section 2(c)(2)(C)(iii)(I)(aa) of the Act, as amended, 7 U.S.C. §2(c)(2)(C)(iii)(I)(aa).

2.     **DCI and Monex NV are Acting as Unregistered RFEDs in Violation of Commission Regulation 5.3(a)(6)(i)**

Commission Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1),  defines an RFED as any person

that is, or offers to be, the counterparty to a forex transaction, except for certain enumerated

entities not applicable here.  Commission Regulation 5.3(a)(6)(i) provides that it is unlawful for

any RFED to operate as such without registering.  17 C.F.R. § 5.3(a)(6)(i) (2014).  DCI and

Monex NV acted, and continue to act, as RFEDs without registering with the Commission.

Through the website, DCI and Monex NV offers, and acts, as the counterparty to financed retail

forex transactions in Vietnamese Dong and/or Iraqi Dinar with actual and prospective customers.

*See* Exhibit 23, *www.dinarcorp.com* website; Exhibit 1, Declaration of K. Koh.  Accordingly,

both DCI and Monex, NV are acting as unregistered RFEDs in violation of Commission

Regulation 5.3(a)(6)(i), 17 C.F.R. § 5.3(a)(6)(ii).

3.     **Tayeh is Acting as an Unregistered AP of an RFED in Violation of Commission Regulation 5.3(a)(6)(ii)**

Commission Regulation 5.1(h)(2), 17 C.F.R. § 5.1(h)(2),  defines an AP of an RFED as

any natural person associated with an RFED as a partner, officer or employee (or any natural

person occupying a similar status or performing similar functions), in any capacity which

involves: (i) the solicitation or acceptance of retail forex customers' orders (other than in a

clerical capacity); or (ii) the supervision of any person or persons so engaged.  Throughout the

relevant period, Tayeh has been the sole officer and shareholder of both DCI and Monex NV,

and has been solely responsible for all solicitations to prospective and actual customers and the

acceptance of all retail forex customers' orders.  Accordingly, Tayeh is acting as an unregistered

AP of DCI and Monex NV, in violation of Commission Regulation 5.3(a)(6)(ii), 17 C.F.R. §

5.3(a)(6)(ii).

**E.    Tayeh is Liable for the Acts of DCI and Monex NV, Pursuant to Section 13(b) of the Act**

Tayeh is for DCI's and Monex NV's violations of the Act and Regulations pursuant to Section 13(b) of the Act, 7 U.S.C. 13c(b), because he was, and is, the controlling person of both DCI and Monex NV and he knowingly induced the underlying violations or failed to act in good faith. "A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself." *In re JCC, Inc.*, [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,080 at 41,576 (CFTC May 12, 1994) (finding principals of company liable because they were officers of a corporation who were involved in monitoring sales activities), *aff'd*, 63 F.3d 1557 (11th Cir. 1995).

Pursuant to Section 13(b) of the Act, a controlling person is liable for the violations of the entity under his control.  To establish liability as a controlling person pursuant to Section 13(b), the Commission must show that the person possesses the requisite degree of control and either: (1) knowingly induced, directly or indirectly, the acts constituting the violation; or (2) failed to act in good faith. *In re Apache Trading Corp.*, [1990-1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 25,251 at 34,766 (CFTC Mar. 11, 1992).  To establish the "knowing inducement" element of the controlling person violation, the Commission must show that "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1998).

Here Tayeh is the controlling person of both DCI and Monex NV and exercised day to day control over their respective operations.  Tayeh is the President and sole shareholder of both

18

DCI and Monex NV, and is therefore in actual and legal control of each entity. *See* Exhibit 3, Verified Third Amended Complaint of Tayeh, *Dinar Corp, Inc., et al. v. Sterling Currency Group, LLC, et al.*, Case No.: 1:14-cv-00714-AT, (N.D. Ga.). Throughout the relevant period, Tayeh failed to act in good faith because he was responsible for the fraudulent conduct and he knew that DCI and Monex NV were not registered as RFEDs as required by federal law, and he not only failed to stop the violative conduct, he actively participated in, and directed the violative conduct. With respect to the fraudulent solicitations, he personally solicited prospective participants and directed the solicitation practices, including the content of the solicitations. Accordingly, Tayeh is liable for DCI's and Monex NV's violations of the Act and Regulations pursuant to Section 13(b) of the Act.

**F.     DCI and Monex NV Are Liable as Principal for the Violations of Tayeh, Under Section 2(a)(1)(B) of the Act and Commission Regulation 1.2**

Tayeh committed the acts and omissions described herein within the course and scope of his employment as an officer and agent of both DCI and Monex NV. Therefore, DCI and Monex NV are liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Commission Regulation 1.2, 17 C. F.R. § 1.2, as a principal for their respective agent's violations of the Act.

**G. Relief Defendants Are Liable for, and Must Ultimately Disgorge, Funds To Which They Have No Legitimate Claim**

Relief Defendants Hudson and Monex AL are liable for purposes of disgorgement for any funds received from Defendants as part of this fraudulent scheme. A district court may freeze the assets of relief defendants. *CFTC v. Kimberlynn Creek Ranch*, 276 F.3d 187, 193 (4th Cir.2002) ("[W]hen a plaintiff seeks equitable relief ..., a district court possesses 'inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief." ' (*quoting Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51

19

F.3d 982, 987 (11th Cir.1995); *SEC v. Heden*, 51 F.Supp.2d 296, 299 (S.D.N.Y.1999). A nominal or relief defendant is a person or entity that has received ill-gotten funds, and does not have a legitimate claim to those funds. *SEC v. Cavanagh*, 155 F.3d 129, 136 (2nd Cir.1998). A relief or nominal defendant is joined to aid in full relief without asserting separate subject matter jurisdiction over the person or entity. *CFTC v. Kimberlynn Creek Ranch*, 276 F.3d at 191; *SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991) (nominal defendant is joined as a means of facilitating collection, no subject matter jurisdiction needs to be asserted as the relief defendant has no ownership interest, but merely possession of the funds that are at the center of the controversy.); *SEC v. Collelo*, 139 F.3d 674, 677 (9th Cir.1998) (In order to effect full relief in recovering assets that are the fruit of the underlying fraud, SEC could name a non-party depository as a relief defendant.) A relief defendant may be a gratuitous beneficiary of the proceeds from the principal defendants' fraud or merely the custodian of the principal defendants' assets. *CFTC v. Hanover Trading Corp.*, 34 F.Supp.2d 203, 207 (S.D.N.Y. 1999).

Here the Relief Defendants have not performed any *bona fide* services for these funds and consequently have no ownership interest in these funds. Any claimed ownership interest by Relief Defendant must be both factually and legally valid. "Otherwise, individuals and institutions holding funds on behalf of wrongdoers would be able to avoid disgorgement (and keep the funds for themselves) simply by stating a claim of ownership, however specious." *Kimberlynn Creek Ranch, Inc.*, 276 F.3d at 192. Throughout the relevant period, Defendants have worked with Hudson, and caused Hudson to create and operate Monex AL, for the purpose of negotiating cashier's checks and money orders made payable by customers to Monex NV, not Monex Al. The Court should restrain funds, assets, or other property owned, controlled, managed, or held by or on behalf of, or for the benefit of each Relief Defendants - and received

20

from the Defendants - because these funds are the proceeds of Defendants' illegal activities and

the Relief Defendants do not have a legitimate claim to these customer funds.

## III.   CONCLUSION

For the foregoing reasons, the Commission requests that the Court issue an *ex parte*

statutory restraining order:  (1) freezing Defendants' and Relief Defendants' assets, (2)

preventing Defendants and Relief Defendants from destroying any records, and (3) permitting

the Commission to inspect and copy Defendants' and Relief Defendants' records and requiring

Defendants and Relief Defendants to provide information necessary to locate and access those

records.

Date: July 27, 2015                                Respectfully Submitted,


/s/ Timothy J. Mulreany
Timothy J. Mulreany (MD Bar # 08262)
JonMarc P. Buffa  (CA Bar # 217324)
Attorneys for the Plaintiff,
U.S. Commodity Futures Trading Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
(202) 418- 5306; tmulreany@cftc.gov (Mulreany)
(202) 418-5332; jbuffa@cftc.gov  (Buffa)
(202) 418-5124 (facsimile)