IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | CASE NO. 1:15-CV-538-WKW [WO] |
| DINAR CORP, *et al.*, | ) ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Before the court is the motion for release of funds to pay attorney's fees (Doc. # 96) filed by Defendants Husam Tayeh, My Monex, Inc., a Nevada corporation ("My Monex Nevada"), and Dinar Corp., Inc. Upon consideration of the motion, the parties' briefs, the transcript of the hearing on the motion held by United States Magistrate Judge Terry F. Moorer, and the discussion held on the record during a telephone conference on January 22, 2016, the court concludes that the motion is due to be granted.

### **I. BACKGROUND AND PROCEDURAL HISTORY**

On July 27, 2015, Plaintiff United States Commodity Futures Trading Commission filed a complaint for injunctive relief, civil monetary penalties, and other equitable relief against Defendants Tayeh, My Monex Nevada, and Dinar Corp., Inc. (collectively, "Defendants"), and Relief Defendants Theodore S.

Hudson, II and My Monex, Inc., an Alabama corporation ("My Monex Alabama") (collectively, "Relief Defendants"), for violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* and the regulations promulgated thereunder. (Doc. # 1.) Plaintiffs also filed an *ex parte* motion for a statutory restraining order to freeze Defendants' and Relief Defendants' assets, to prohibit Defendants and Relief Defendants from destroying records, and to require Defendants and Relief Defendants to allow Plaintiff to inspect and copy records.[1] (Doc. # 5.) In addition, Plaintiff filed a motion for a preliminary injunction to impose the same relief as Plaintiff sought in the motion for a statutory restraining order. (Doc. # 3.)

On September 3, 2015, the court held a hearing in the case on the following motions: (1) Plaintiff's motion for a preliminary injunction (Doc. # 3) as it pertained to Defendants;[2] (2) Plaintiff's two motions for issuance of orders to Defendants and their counsel to show cause why they should not be held in contempt (Doc. # 54; Doc. # 55); (3) Defendants' motion to dismiss (Doc. # 57); and Defendants' motion to stay (Doc. # 59). At the hearing, the parties represented

---

[1] On July 27, 2015, the court entered a Statutory Restraining Order, which froze Defendants' and Relief Defendants' assets, among other relief. (Doc. # 8.) After several extensions by court order on consent of the parties, the Statutory Restraining Order expired as to Relief Defendants on August 24, 2015 (Doc. # 43) and as to Defendants on September 22, 2015 (Doc. # 83; Doc. # 93).

[2] On August 17, 2015, the court entered a consent order of preliminary injunction as to Relief Defendants. (Doc. # 21.) In light of the entry of the consent preliminary injunction as to the Relief Defendants, on August 21, 2015, the court denied the motion for preliminary injunction (Doc. # 3) in part as moot as to Relief Defendants only. (Doc. # 44.)

2

that they had "negotiated in good faith" and had reached a resolution of the pending motions. (Doc. # 89 at 3-4 (statements of Plaintiff's counsel).) The parties agreed to dismiss their pending motions[3] and to the terms of a consent preliminary injunction. (Doc. # 89 at 3-4.) Further, the parties agreed to engage in limited expedited discovery as to the number and extent of transactions that were conducted on a cash basis. (Doc. # 89 at 4-5.) Plaintiff stipulated that any cash transactions were not subject to the Commodities Exchange Act. (Doc. # 89 at 9.) The parties agreed that the consent order would include "the standard terms that [Plaintiff] includes, which is that [Defendants] will make application to the [c]ourt for a carve-out of attorney's fees and that [Plaintiff] will reserve its right to object should it feel that's necessary." (Doc. # 89 at 9-10.) The parties stated their "belief . . . that the carve-out application will, in all likelihood, come from the cash transactions." (Doc. # 89 at 10.) At the hearing, Plaintiff did not assert that it would oppose the payment of attorney's fees based upon a tainted or comingled funds argument.

Subsequently, the parties submitted a joint proposed consent order of preliminary injunction, which the court entered on September 22, 2015. (Doc. # 90; Doc. # 93.) The September 22, 2015 consent preliminary injunction order

---

[3] In agreeing to dismiss the pending motions, Defendants specifically reserved their argument that the transactions at issue in this case are not "financed" and, therefore, do not fall within the purview of the Commodity Exchange Act and regulations. (Doc. # 89 at 3-4.)

froze Defendants' assets "derived from or otherwise related to the activities alleged in the . . . complaint, regardless of when the asset was obtained." (Doc. # 93 at ¶ II.4.) The September 22, 2015 consent preliminary injunction order further stated:

> This court will entertain an application by Defendants for reasonable and necessary living expenses and attorneys' fees upon proper written submission. Proper submission requires that Defendants file such application under oath with the Clerk of the Court and set forth in detail, fully substantiated by all relevant documentation, the amount of funds necessary to pay reasonable and necessary living expenses, a description of the expenses for which those funds are to be applied, a description of the assets sought to be used to pay such expenses, and a description of the derivation of such assets. **Within 7 days** of Defendants' filing of an application for reasonable and necessary living expenses or attorneys' fees, [Plaintiff] may object or otherwise respond to such application.

(Doc. # 93 at ¶ II.6. (emphasis in original).)

By separate order entered on September 22, 2015, in accordance with the parties' agreement, the court granted the parties forty-five days to conduct "expedited discovery limited to gathering records of Defendants' cash transactions." (Doc. # 92 at ¶ 6.) Plaintiff was ordered to "prepare and submit a spreadsheet of Defendants' cash transactions," and the court stated that the information Plaintiff provided regarding the cash transactions "may be considered in aid of Defendants' making application to the court to request attorney fees." (Doc. # 92 at ¶ 6.) The court directed Plaintiff to file a status report on or before December 1, 2015. (Doc. # 92 at ¶ 7.)

On October 14, 2015, Defendants filed a motion for release of funds to pay attorney's fees (Doc. # 96), which Plaintiff opposes (Doc. # 99). The court referred Defendants' motion for release of funds to the Magistrate Judge (Doc. # 101), and, on December 1, 2015, the Magistrate Judge held a hearing on the motion. (Doc. # 107.)

Meanwhile, Plaintiff was unable to complete the expedited discovery necessary to provide the required spreadsheet of cash transactions within the forty-five day window. Therefore, on October 19, 2015, the court granted Plaintiff's unopposed motion (Doc. # 97) to extend the expedited discovery deadline to December 21, 2015. (Doc. # 98.)

On November 25, 2015, Plaintiff filed a status report detailing the progress of the expedited discovery. (Doc. # 105.) Plaintiff stated that it had determined that approximately 14% of the transactions conducted in 2012 and 2013 were cash transactions. (Doc. # 105 at ¶¶ 2-3.) For the years 2012 and 2013, out of a total $33,388,310.28 in transactions, $4,655,355.77 was the product of cash transactions, and $27,642,954.43 was the product of allegedly financed transactions. (Doc. # 105 at ¶ 2.) In the joint status report, Plaintiff argued for the first time that, because the Government had seized only $2,000,000.00 in assets, which is less than the amount of allegedly financed transactions, Plaintiff should be entitled to hold *all* seized assets for payment of restitution, disgorgement, and civil

5

monetary penalties. (Doc. # 105 at 4.)

On December 21, 2015, Plaintiff filed a second motion to extend the expedited discovery deadline. (Doc. # 109.) Defendants opposed the motion on grounds that they needed funds from the cash transactions to pay for legal expenses and because they faced continuing financial distress as a result of the ongoing freeze of all their assets. (Doc. # 110.) On January 22, 2016, the court held a status conference on the motion. (Doc. # 113.) Because Defendants' motion for release of funds to pay attorney's fees and Plaintiff's motion to extend the discovery deadline were intertwined, the court addressed the motion for attorney's fees at the January 22, 2016 telephone status conference.[4]  Following the status conference, the court denied the motion to extend the expedited discovery period and instead directed the parties to submit a plan for discovery on the limited issue of whether the allegedly illegal transactions were "financed" within the meaning of the pertinent statutes and regulations. (Doc. # 114.)

## II. DISCUSSION

"The Commodity Exchange Act drapes the district court with broad equitable power," including the power to "freeze a defendant's assets to ensure the adequacy of a disgorgement remedy." *CFTC v. Levy*, 541 F.3d 1102, 1114 (11th

---

[4] The Magistrate Judge attended the status conference, and the parties were notified of this fact at the outset of the conference.

Cir. 2008). "However, 'the general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.'" *F.T.C. v. Lalonde*, 545 F. App'x 825, 832 (11th Cir. 2013) (quoting *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994)).

Corollary to the court's equitable discretionary authority to temporarily freeze personal assets, the court also has discretion to release some frozen assets for payment of reasonable attorney's fees in civil cases, although the court is not automatically required to do so. *S.E.C. v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427, 429 (S.D.N.Y. 2001); *see also CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995) (holding that "[a] district court may, within its discretion, forbid or limit payment of attorney fees out of frozen assets," but that a district court may grant such relief "in light of the fact that wrongdoing is not yet proved when the application for attorney fees is made"); *CFTC v. Am. Metals Exch. Corp.*, 991 F.2d 71, 79 (3d Cir. 1993) (stating the decision to release frozen funds to pay attorney's fees "is entrusted to the discretion of the district court"); *F.T.C. v. Lalonde*, 545 F. App'x 825, 832 (11th Cir. 2013) ("The Ninth Circuit has persuasively held [in *Noble Metals, supra*] that the right to retain counsel does not *require* the release of frozen assets so that a defendant in a civil case may hire attorneys or experts, or otherwise defend his claim." (emphasis added)). *But see*

7

*S.E.C. v. Dowdell*, 175 F. Supp. 2d 850, 855 (W.D. Va. 2001) ("The case law is anything but consistent on whether defendants in this type of civil enforcement action may be permitted to pay attorney's fees with a portion of their frozen assets." (collecting cases)).

"Considerations weighed by courts in determining whether to pay attorney fees from frozen funds include preserving the funds for defrauded victims and maintaining fairness in the legal proceedings, particularly proceedings involving complex matters." *S.E.C. v. Petters*, No. CIV. 09-1750 ADM JSM, 2010 WL 4922993, at *1 (D. Minn. Nov. 29, 2010) (citing *Dowdell*, 175 F. Supp. 2d at 855–56). "While the primary purpose of freezing assets is to facilitate compensation of defrauded investors in the event a violation is established at trial, 'the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief.'" *Gonzalez*, 170 F. Supp. 2d at 429 (quoting S.*E.C. v. Manor Nursing Centers, Inc*., 458 F.2d 1082 (2d Cir. 1972)).

In opposition to Defendants' motion for release of funds, Plaintiff concedes Defendants' attorneys are entitled to be compensated for the work they claim to have performed. However, Plaintiff argues that Defendants are not entitled to use a portion of the frozen funds for the undisputed legal bill because Defendants' application failed to comply with the terms of the September 22, 2015 Consent

8

Preliminary Injunction Order, which required Defendants to support their application for release of funds with an affidavit containing a "description of the derivation of . . . assets" to be unfrozen.  (Doc. # 99 at 1; Doc. # 108 at 10; Doc. # 93 at ¶ II.6.)  However, as Defendants point out, (Doc. # 108 at 11), by agreement and by court order, Plaintiff was responsible for "prepar[ing] and submit[ting] a spreadsheet of Defendants' cash transactions" for consideration "in aid of Defendants' making application to the court to request attorney fees."  (Doc. # 92 at ¶6.)  In September 2015, neither the court nor the parties contemplated that a spreadsheet would not be produced within a reasonable time for Defendants to apply for attorney's fees.  Plaintiff's inability to provide Defendants with an accounting prejudiced Defendants' ability to support their motion for release of funds with an affidavit describing the derivation of the assets to be unfrozen.  In keeping with the court's authority to interpret and apply its own orders in these unforeseen circumstances, the court finds that Defendants' application should not be denied on grounds that they failed to submit an affidavit detailing the source of the funds.

Plaintiff relies solely on the consent preliminary injunction order (Doc. # 93) as grounds for placing the burden on Defendants to establish that funds to be unfrozen are not tainted.  Apart from that order, neither party has established which of them has the legal burden at this point in the proceedings to demonstrate

9

whether the frozen funds are the product of illegal activity.  7 U.S.C. § 13a-1(b) grants the court the authority to freeze assets "[u]pon a proper showing" by Plaintiff.  In this case, however, Defendants' assets were frozen by consent, and not on the basis of any finding or stipulation that Plaintiff made a "proper showing" to support the injunction.  In fact, as part of the agreement reached at the September 3, 2015 hearing, Defendants preserved their argument that none of the transactions or funds at issue are subject to the Commodities Exchange Act.  (Doc. # 92 at 2-3.)  Moreover, as a result of the same legal work for which Defendants now seek funds, at least some transactions (the cash transactions) are not governed by the Act.  Because there has been no finding that Plaintiff made a "proper showing" of a Commodities Exchange Act violation or that the frozen funds are related to such a violation, the court will not assume that, at this point, Defendants carry the burden of demonstrating that the funds they seek to access are untainted funds.

    Plaintiff argues that payment of attorney's fees is not appropriate because proceeds from cash transactions have been so comingled with proceeds from other funds that they cannot be separately identified and, therefore, all funds should be considered tainted by the alleged violations of the Commodities Exchange Act.[5]

---

[5] The court notes that Plaintiff was able to determine that approximately 14% of transactions conducted in 2012 and 2013 were cash transactions, and Plaintiff was also able to

(Doc. # 99.)  Plaintiff also argues that at least $27,000,000.00 in transactions were allegedly illegal, and because Plaintiff has "only seized [$2,000,000.00] in assets," there is "nothing to be dispersed to [D]efendants."  (Doc. # 108 at 8-9.)  Plaintiff argues that, "[t]o the extent that [it] seizes funds . . . in excess of [$27,000,000.00], then that would be a proper application for the defendants to say, well, there appears to be an overage; we'd like some of that for our usage.  But that's not happening here.  There's simply no funds available."  (Doc. # 108 at 9.)

According to Defendants, during the September 3, 2015 negotiations, they understood that, once the parties determined the percentage of cash transactions, they would be permitted to use that figure as a basis to apply for attorney's fees.  Defendants argue that the parties would not have reached an agreement on September 3, 2015 to resolve their respective motions if Plaintiff "had told [Defendants], look we're going to object to your attorney fee application; we're not going to get you these numbers within 45 days; we're going to make it so that you can't get paid for the work that you've done; and we don't know whether you're ever going to get paid." (Doc. # 108 at 12), or if Plaintiff had conveyed its position that no funds should be released for payment of attorneys' fees until after sufficient assets had been frozen to cover the tens of millions of dollars in allegedly illegal transactions.  There is no evidence that, at the time the parties' reached their

---

determine the respective dollar amounts of cash and allegedly financed transactions for those years. (Doc. # 105.)

agreement, Plaintiff intended to assert arguments that no funds are accessible for attorney's fees because all frozen funds are tainted or because the frozen assets are insufficient to compensate all the alleged.[6] Had that been the case, it is unlikely the parties would have reached an agreement.

The law is unsettled regarding whether all funds in similar circumstances must be considered tainted, at least up to the amount necessary to cover any potential judgment in the case. *See Dowdell*, 175 F. Supp. 2d at 850 (recognizing a split in authority as to whether frozen assets may be used to pay attorney's fees); *see also, e.g., Noble Metals*, 67 F.3d at 775 ("[T]he frozen assets fell far short of the amount needed to compensate [the victims of fraudulent futures contracts]. This was reason enough in the circumstances of this case for the district court, in the exercise of its discretion, to deny the attorney fee application. . . . We do not, however, intimate that attorney fee applications may always be denied where the assets are insufficient to cover the claims. Discretion must be exercised by the

---

[6] The court notes the Eleventh Circuit's holding in *CFTC v. Wilshire Investment Management Corp.*, 531 F.3d 1339, 1344-45 (11th Cir. 2008), that the amount of equitable restitution available under the Commodities Exchange Act, 7 U.S.C. § 13a–1 is based on restitution and disgorgement of the amount of wrongful gains by unjust enrichment, not on the total value of allegedly illegal transactions or on the amount required to compensate victims for their losses. *See Levy*, 541 F.3d at 1113 (reversing a district court's "restitution" award in an amount calculated to compensate victims for their losses on grounds that, "[i]n light of *Wilshire*, we are required to conclude that [the defendant] can only be liable in restitution to the extent of his unjust enrichment"). Plaintiff has made no showing that the amount of the transactions at issue or the amount of the potential victims' losses would be equivalent to the amount of unjust enrichment. In light of *Wilshire*, the court is wary of Plaintiff's argument that Defendants may access frozen funds to pay legal expenses only after Plaintiff has seized sufficient assets to cover the value of all allegedly illegal transactions or to compensate all potential victims' losses.

district court in light of the fact that wrongdoing is not yet proved when the application for attorney fees is made."); *FTC v. RCA Credit Servs., LLC*, No. 08–cv–2062, 2008 WL 5428039, at *4 (M.D. Fla. Dec. 31, 2008) (recommendation of the magistrate judge recognizing that, following entry of preliminary injunction, the court has discretion to deny attorney's fees "if the frozen assets fall short of the amount needed to compensate consumers for their losses").

Plaintiff acknowledges that the law in this area is unsettled, but it remains resolute in its hard-line stance that no attorney's fees should be paid unless Defendants can clearly establish the funds come from a completely untainted source. Plaintiffs rely upon only a few cases in their brief in opposition. (Doc. # 99 at 2-3.) The cases Plaintiff cites as resolute authority are not completely comparable to the situation at hand. Plaintiff relies almost exclusively on *S.E.C. v. Sunwest Management, Inc.*, No. 09–6056–HO, 2009 WL 3245879 (D. Or. 2009), and the other case citations are merely a cut and paste from this one case. *Sunwest Management* concerned whether, in determining the most equitable approach to distributing funds to Ponzi scheme victims at the close of an SEC receivership case, the court should award funds on a *pro rata* basis, or whether the court should instead permit investors who could trace invested funds to recover the traceable funds, to the detriment of other claimants. 2009 WL 324879, at *9. Thus, the case provides no meaningful guidance in resolving the equities of releasing funds to pay

13

attorney's fees from assets that were frozen on the basis of a consent preliminary injunction entered in a civil enforcement case without a finding of probability of wrongdoing by Defendants, and Plaintiff's argument is not well supported.[7]

Plaintiff cursorily cites *S.E.C. v. Lauer*, No. 03-80612-CIV, 2009 WL 812719, at *4 (S.D. Fla. Mar. 26, 2009). In *Lauer*, the district court denied access to funds frozen in a civil enforcement case for use in a parallel criminal proceeding on grounds that all funds (even allegedly untainted ones) were subject to a superior IRS tax lien, all funds were tainted by the fraud, and, in any event, it would be impossible to differentiate between "tainted" and "untainted" dollars in a commingled bank account by tracing funds from pre-fraud activities. *Lauer*, 2009

---

[7] Other cases Plaintiff cursorily cites are similarly unhelpful for resolving the issue facing this court. *See S.E.C. v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (holding that "the district court . . . did not abuse its discretion" in distributing the total amount of seized Ponzi scheme funds to all victims on a *pro rata* basis even though funds from two victims who objected to the *pro rata* distribution had been maintained in a separate bank account); *United States v. Durham*, 86 F.3d 70, 73 (5th Cir. 1996) (affirming distribution of funds from a fraudulent loan financing business on a *pro rata* basis on grounds that following a tracing principle would inequitably "allow [one victim] to benefit merely because the defendants spent the other victims' funds first"); *United States v. Garcia*, 37 F.3d 1359, 1365 (9th Cir. 1994) (holding that, for purposes of proving a criminal violation "under the money laundering statutes, due to the fungibility of money, it is sufficient to prove that the funds in question came from an account in which tainted proceeds were commingled with other funds"); *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009) *aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010) *and aff'd sub nom. S.E.C. v. Orgel*, 407 F. App'x 504 (2d Cir. 2010) (rejecting Ponzi scheme victim's arguments that "a *pro rata* distribution is unfair, and that the distribution should instead be made based on level of risk, timing of investment, tracing analysis, or some other factor"); *CFTC v. Eustace*, No. CIV.A. 05-2973, 2008 WL 471574, at *7 (E.D. Pa. Feb. 19, 2008) (refusing to distribute receivership funds to victims of a Ponzi scheme on the basis of tracing methods, instead approving the receiver's proposed *pro rata* distribution plan); *S.E.C. v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 181 (D.D.C. 1998) *aff'd*, 203 F.3d 54 (D.C. Cir. 1999) (holding, after finding that a Ponzi scheme existed, that, "when legitimate assets are co-mingled with illegitimate ones such that the assets cannot be separated out, a constructive trust [in favor of the Ponzi scheme victims] may extend over the entire asset pool").

WL 812719, at *4.  The district court relied on *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999), and its statement that "[o]nce tainted, proceeds cannot become untainted."  *Ward*, a criminal case, addressed whether the government is required to trace the origin of the commingled funds to establish the elements of the crime of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).  However, in considering whether assets must be forfeited following a conviction under § 1956, "[t]he mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture."  *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003).  Moreover, in *Lauer*, by the time the district court entered the order denying access to funds for legal expenses,[8] the court had already "granted summary judgment in favor of the SEC and against [the defendant] finding that [the defendant] committed a massive securities fraud."  *Id*. at *1.  In this case, by the terms of the very agreement that led to the entry of the preliminary injunction, there currently exists an unresolved dispute over whether *any* frozen funds are the product of Commodities Exchange Act violations.  *Lauer* provides little guidance as to the

---

[8] The Eleventh Circuit has not addressed the district court order in *Lauer* cited by Plaintiffs. However, in addressing previous orders from the district court refusing to modify the asset freeze to allow for living and litigation expenses, the Eleventh Circuit noted that, "if potential disgorgement is greater than the value of the defendant's assets, the district court *can* order a full asset freeze." *S.E.C. v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (emphasis added). The Eleventh Circuit affirmed the district court's full freeze order and subsequent refusals to modify it on grounds that the district court's orders, "though perhaps heavy-handed" were not an abuse of "the broad discretion district courts have in this realm." *Id.* (emphasis added).

equitable considerations here.

As Defendants point out, several courts have exercised their equitable authority and broad discretion to release funds to pay attorney's fees in similar cases. *See, e.g., S.E.C. v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (noting that "the court indicated willingness to release small amounts" of assets frozen by a preliminary injunction "so that [the defendant] could defend this suit, and on occasion the court did so"); *Dowdell*, 175 F. Supp. 2d at 855-56 (granting a motion to access funds for attorney's fees based on concerns of fairness and the complexity of the case); *Gonzalez*, 170 F. Supp. 2d at 430-31 (allowing modification of preliminary injunction to pay for attorney's fees on grounds that "the inference upon which the freeze was granted may not be supported by the necessary quantum of proof," "motions for summary judgment have been made, yet just argued," and both defendants "incurred substantial [legal] expenses as a consequence of this action.").

The court has weighed the disadvantages and possible deleterious effect of the freeze against the considerations indicating the need for such relief at this time. *See Gonzalez*, 170 F. Supp. 2d at 429. In so doing, the court has considered the current procedural posture of the case, the preliminary injunction's primary purpose of preserving funds for victim restitution if Plaintiff succeeds in proving its case, the fact that the preliminary injunction was entered by consent without

requiring Plaintiff to carry its burden to show that the frozen funds were the product of illegal activity, the equitable rule that assets unrelated to the illegal activity may not be preserved to satisfy a potential judgment, and the need for maintaining fairness in these complex legal proceedings. *Lalonde*, 545 F. App'x at 832; *Noble Metals*, 67 F.3d at 775 (noting that a district court has discretion to grant relief "in light of the fact that wrongdoing is not yet proved when the application for attorney fees is made"); *Petters*, 2010 WL 4922993, at *1. Moreover, in *Dowdell*, the district judge stated, "[t]his court's central concern is the fairness of the proceedings. The court does not believe that it could achieve a fair result at the preliminary injunction hearing were it to deny defendants the ability to retain counsel. This is a complex legal matter, and lawyers are essential to the presentation of issues related to it." *Dowdell*, 175 F. Supp. 2d at 856. The same holds true in the case at hand. In performing the work for which they now seek compensation, Defendants' attorneys have thus far presented themselves to be an asset to the efficient disposition of this case by simplifying issues, and, as a result of their zealous defense of this action, Plaintiff ultimately acknowledged it does not have jurisdiction over the cash transactions. Plaintiff does not deny they have earned their fees. In light of all relevant equitable considerations, the preliminary injunction will modified to allow for the requested attorney's fees.

As a result of the delay in the initial accounting, the exact percentage of cash

transactions has not been determined. However, the range is somewhere between 14% – 50%. Therefore, at a minimum, Plaintiff has acknowledged that 14% of the transactions they have reviewed are cash transactions (*i.e.*, they are clean) and are not subject to Plaintiff's forfeiture action. The court is confident that, at present, the attorney's fees can be covered without exceeding 14% of the frozen funds.[9] Not only did the parties agree to allowing attorney's fees on the basis of the percentage of cash transactions, but equity supports it. Therefore, the court will grant the relief requested at this time. Further, until such time as Plaintiff produces a spreadsheet of Defendants' cash transactions, the court will consider well-supported applications from Defendants for reasonable attorney's fees up to the amount of $280,000.00 without requiring Defendants to first file an affidavit detailing the source of the funds.

### III.   CONCLUSION

Accordingly, it is ORDERED:

1.   The Order referring Defendants' Motion for Modification of Preliminary Injunction Order for Release of Funds to Pay Attorneys' Fees (Doc. # 96) to the Magistrate Judge (Doc. # 101) is VACATED;

2.   Defendants' Motion for Modification of Preliminary Injunction Order for

---

[9] Fourteen percent of two million is $280,000.00, which well exceeds the current request for attorney's fees.

Release of Funds to Pay Attorneys' Fees (Doc. # 96) is GRANTED.

3. The following funds shall be RELEASED to Defendants' counsel: $20,000.00 of the funds held by Ifrah, PLLC, and $75,000.00 of the funds held by Cozen O'Connor. The funds shall be paid as follows: $45,000.00 shall be paid to the firm of Burr & Foreman, LLP; $25,000.00 shall be paid to the firm of Ifrah PLLC for legal services previously rendered; and the remainder shall be held in trust by Ifrah PLLC for payment of additional reasonable attorney's fees incurred in the defense of this case. In the event that any of the funds held in trust remain unused at the close of this case, Ifrah PLLC shall so notify the court within 7 days of the entry of a final judgment.

4. Paragraph II.6. of the September 22, 2015 Consent Order of Preliminary Injunction (Doc. # 93) is MODIFIED as follows:

> This court will entertain an application by Defendants for reasonable and necessary living expenses and attorneys' fees upon proper written submission. Proper submission requires that Defendants file such application under oath with the Clerk of the court and set forth in detail, fully substantiated by all relevant documentation, the amount of funds necessary to pay reasonable and necessary living expenses, a description of the expenses for which those funds are to be applied, a description of the assets sought to be used to pay such expenses, and a description of the derivation of such assets. **However, the requirement that a motion for attorney's fees include a sworn description of the derivation of assets is suspended until such time as the Commission produces a spreadsheet of Defendants' cash transactions, or until such time as the total amount of all reasonable attorney's fees sought by Defendants exceeds the sum $280,000.00, whichever occurs first. In the event that the Commission provides the spreadsheet to Defendants, the**

**Commission shall promptly notify the court that it has done so.** Within 7 days of Defendants' filing of an application reasonable and necessary living expenses or attorneys' fees, the Commission may object or otherwise respond to such application.

All other provisions of the September 22, 2015 Consent Order of Preliminary Injunction (Doc. # 93) remain unmodified and in full force and effect. This order does not affect any requirements for applications for living expenses, including the requirement that such applications be supported by an affidavit describing the derivation of any assets sought to be released. (Doc. # 93 ¶ II.6.)

DONE this 29th day of February, 2016.

                                          /s/ W. Keith Watkins
                                  CHIEF UNITED STATES DISTRICT JUDGE