IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-cv-538-ALB |
| | ) | |
| DINAR CORP., INC., MY MONEX, INC., a Nevada corporation, and HUSAM TAYEH, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In the wake of a federal investigation into Defendants Husam Tayeh, Dinar Corp., Inc., and My Monex, Inc., a Nevada corporation, Plaintiff Commodity Futures Trading Commission brought the present civil action. The Court previously found Defendants liable for violating the Commodity Exchange Act and entered a permanent injunction. (Doc. 180). Now all that remains before the Court is calculating the appropriate amount, if any, of disgorgement and a civil monetary penalty.

## BACKGROUND

Husam Tayeh ran a scheme to sell Iraqi dinar. (Doc. 216 at 4). As part of this scheme, Tayeh created multiple business entities, including Dinar Corp, Inc. and My

Monex, Inc. Neither Tayeh nor his businesses ever registered with the CFTC. (Doc. 216 at 2). Customers interacted with Dinar Corp. through the website "www.dinarcorp.com." (Doc. 216 at 4). Customers paid for dinar with United States dollars in the form of cashier's checks or money orders payable to My Monex. (Doc. 216 at 4). Tayeh then sent these payments to an individual in Dothan, Alabama for processing. (Doc. 216 at 4).

As part of this scheme, Tayeh offered an installment contract option. (Doc. 216 at 4). Under the installment contract option, Tayeh promised, upon receipt of an initial ten-percent payment, to set aside the full amount of dinar called for by the contract as well as an additional quantity of dinar that would be available for purchase at a locked-in price. (Doc. 216 at 4). Tayeh promised to transfer the reserved dinar to the customer after receiving the remaining payments. (Doc. 216 at 4).

Despite his promises, Tayeh set aside only a small fraction of the dinar that he sold through installment contracts. (Doc. 216 at 5). Although Tayeh did fulfill some contracts for dinar, he did not actually have the hard currency necessary to fulfill contracts as they were issued. When Tayeh was sentenced in a related criminal case, the United States described the scheme as follows:

> Through Dinar Corp., Tayeh offered for sale—primarily to currency speculators—Iraqi currency, dinar. One of the vehicles through which Tayeh sold dinars was installment contracts. Under those contracts, upon receipt of a customer's initial payment, Tayeh promised to set

aside the total Iraqi dinars to be purchased under the contract. Tayeh assured customers that he would send to them their reserved dinar upon receipt of their final payments. Tayeh defrauded customers in that he did not actually set aside Iraqi dinars pursuant to installment contracts. Nor did Tayeh have sufficient Iraqi dinars on hand or accessible to fill all installment contracts should all installment contract customers complete their payments. In essence, Tayeh's business depended upon installment customers defaulting on their contracts and forfeiting the amounts they had already paid.

*United States v. Tayeh*, Case No. 1:16-cr-213-WKW-TFM, at Doc. 26 (M.D. Ala. 2016) (Sentencing Memorandum). *See also id.* at Doc. 32 (Final Presentence Investigation Report); *id.* at Doc. 11 (Plea Agreement). The United States also explained that the scheme succeeded because "there was never an instance in which enough of Tayeh's customers completed their installment contracts at the same time so that Tayeh was unable to fulfill an order for dinars." *Id.* at Doc. 40 (Statement on Restitution).

The beginning of the end for Tayeh's scheme came when government agents executed warrants at his business. The CFTC's Complaint in this case followed, and the Court issued a preliminary injunction to stop Dinar Corp. from selling currency. (Doc. 1).

Nearly a year later, the United States filed a felony information against Tayeh in *United States v. Husam Usama Tayeh*, Case No. 1:16-cr-213-WKW-TFM (M.D. Ala. 2016). (Doc. 216 at 3). Following Tayeh's guilty plea, the court sentenced Tayeh to be imprisoned for twelve months and a day with a year of supervised

3

release, to forfeit more than $8,000,000 in property and bank accounts, and to pay $151,517.25 in restitution to his identified victims. *Tayeh*, Case No. 1:16-cr-213-WKW-TFM, at Doc. 64 (Amended Judgment).

After the criminal case was resolved, this civil case resumed.

The parties agreed to a finding on liability and a permanent injunction against continued trading activity. (Doc. 180.) Among other things, Tayeh conceded liability for making one or more fraudulent misrepresentations in violation of 7 U.S.C. §6b(a)(2)(A), (C) and 17 C.F.R. §5.2(b)(1), (3) and failing to register as an associated person of a retail foreign exchange dealer in violation of 7 U.S.C. §2(c)(2)(C)(iii)(I)(aa) and 7 C.F.R. §5.3(a)(6)(ii). (*See* Doc. 180.)

The parties continued to dispute, however, what Defendants should have to pay as disgorgement and a civil penalty. The CFTC filed a motion for summary judgment seeking $25,785,000 in disgorgement, which it estimated to be the total amount of money that had been deposited in Defendants' bank accounts for installment transactions, and $77,355,000 in statutory penalties, which is three times the disgorgement calculation. (Doc. 188.) The Court denied the motion. *See C.F.T.C. v. Dinar Corp, Inc.*, 2019 WL 3842069, at *3 (M.D. Ala. May 30, 2019). Among other things, the Court questioned whether Defendants' financial gain could more accurately be measured for purposes of disgorgement and whether a maximum penalty of three times this figure was justified as a civil penalty.

4

The Court held a bench trial on these issues at which both sides presented evidence. The Court also took judicial notice of the filings in the criminal case. (Doc. 218 at 4).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

There are two issues before the Court: the appropriate amount of disgorgement and a civil monetary penalty.[1] As to the first issue, the CFTC asserts that the proper measure of disgorgement is Tayeh's gross gain from the scheme. Tayeh, for his part, wants the Court to use his net gain, which would reduce the disgorgement amount for legitimate business expenses. As to the second issue, the CFTC requests a civil monetary penalty in the amount of "triple the monetary gain" Tayeh received for violating the Act. Tayeh requests a lesser penalty because of an alleged inability to pay and because his conduct did not involve actual losses to consumers, only potential losses.

### A. Disgorgement

The parties have stipulated to the total amount of Tayeh's overall gain from his scheme: $22,559,153.85. The CFTC argues that the Court should order disgorgement in this amount without any deduction for business expenses, even the cost of actual foreign currency that Tayeh provided to customers. Tayeh responds

---

[1] The CFTC's right to disgorgement and a civil monetary penalty under 7 U.S.C. §13a-1(d) is undisputed.

that a defendant cannot be ordered to disgorge money that he spent on legitimate business expenses, even if the business itself was illegitimate. Accordingly, he contends the disgorgement amount should be substantially reduced.

"Disgorgement is an equitable remedy intended to prevent unjust enrichment." *C.F.T.C. v. Sidoti*, 178 F.3d 1132, 1138 (11th Cir. 1999)). As such, "[d]isgorgement is remedial and not punitive. The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing." *C.F.T.C v. Stroud*, 2016 WL 9774506, at *6 (M.D. Ala. March 1, 2016) (quoting *S.E.C. v. Blatt*, 583 F.2d 1325, 1335 (5th Cir. 1978)). The court calculates wrongful gains "with straightforward arithmetic, *i.e.* the amount taken less the amount returned … and the amount lost in trading … plus post judgment interest." *Id.* The court may also consider any funds used as operating expenses or salaries to be profit. *Id.* at *7.

The parties dispute whether the Court should account for legitimate business expenses in its disgorgement order. The Eleventh Circuit has agreed with the Second Circuit's view that "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *F.T.C. v. Wash. Data Res., Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013) (internal quotation marks omitted) (quoting *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011)); *see also S.E.C. v. Aerokinetic Energy Corp.*, 444 F. App'x 382, 385 (11th Cir. 2011) (The caselaw

"overwhelmingly hold[s] that how a defendant chooses to spend his ill-gotten gains, whether it be for business expenses, personal use, or otherwise, is immaterial to disgorgement." (internal quotation marks omitted)).

However, there is a pending case before the Eleventh Circuit that raises the issue of whether a more recent Supreme Court decision, *Kokesh v. S.E.C.*, undermines the Circuit's position on disgorgement. *S. Trust Metals, Inc.*, 391 F. Supp. 3d 1167, 1174 (S.D. Fla. 2019). In *Kokesh*, the Supreme Court relied on the Restatement (Third) of Restitution and Unjust Enrichment, which provides that an order of disgorgement that fails to account for legitimate expenses "does not simply restore the status quo; it leaves the defendant worse off." 137 S.Ct. 1635, 1645 (2017) (quoting Restatement (Third) of Restitution and Unjust Enrichment §51, Comment *h*, at 216) (unanimous op.). But in the same opinion, the Court limited its adoption of the Restatement: "[n]othing in this opinion should be interpreted as an opinion on … whether courts have properly applied disgorgement principles in this context. The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to §2462's limitations period." *Id.* at 1642 n.3.

There was very little hard evidence presented at the bench trial about Tayeh's financial gains from his activities. The CFTC seized records from Tayeh and analyzed them with the help of the FBI. (Doc. 216 at 5). After repeated demands

from the CFTC, Tayeh produced an electronic spreadsheet of customer transactions. (Doc. 216 at 5). Between the records and the spreadsheet, the CFTC determined that there were approximately 230,057 "completed and/or payment received" cash and financed transactions. (Doc. 216 at 5–6). Because the CFTC has jurisdiction over only financed transactions, the CFTC focused on those. (Doc. 216 at 11).

The parties stipulated that, in total, Tayeh's scheme resulted in deposits of $27,000,000 in customer funds. (Doc. 216 at 11). Of this total, $4,289,328.90 were cash orders over which the CFTC did not have jurisdiction. (Doc. 216 at 11). So, the CFTC has jurisdiction over the remaining $22,710,671.10. (Doc. 216 at 11). The parties also agreed that Tayeh's gain should be reduced by the $151,517.25 in restitution already paid in the criminal case, which leaves $22,559,153.85 in gain. (Doc. 216 at 11).

At the bench trial, two witnesses testified: Special Agent Patricia Gomersall and Defendant Husam Tayeh. Gomersall walked through various documents that the CFTC used to arrive at its disgorgement calculation and testified about the absence of other business records that would allow the Court to deduct legitimate business expenses from this figure. Tayeh testified that he lost his business records when his office was raided by investigators and that he ultimately kept very little of the overall amount of money that flowed through his business bank accounts.

The Court finds Agent Gomersall's testimony to be credible. She has a lengthy history of relevant experience on both sides of the regulatory table. After earning her Bachelor of Science degree from the University of Colorado Boulder, she spent five years as a registered associated person (commodities futures trading broker) for E.F. Hutton. (Doc. 218 at 22–23). After E.F. Hutton, she moved to the CFTC, where she has been a futures trading investigator for thirty-two years and is now a senior future trading investigator. (Doc. 218 at 22). Her testimony was crisp, clear, and to the point.

The same cannot be said for Tayeh. During his testimony, Tayeh was evasive, dissembling, combative, and generally unhelpful to his cause. For example, to the CFTC's repeated questioning about key facts in the case, Tayeh responded only, "I don't recall." (Doc. 218 at 93, 96, 98). His evasive behavior even extended to simple, foundational documents. For example, one of these documents, a K-1, showed the name "Husam Tayeh" and an address:

Q. … That's you sir; correct?

A. No, actually.

Q. That's not you?

A. My name is Husam Usama Tayeh.

Q. Okay. So you're claiming that the Husam Tayeh of Bridgeview, Illinois, identified with Dinar Corp., the defendant, of which you are the sole shareholder, sole officer, and controlling person, that's not you. Is that your testimony under oath here today, sir?

> A. Well, the problem is the address is covered up, so I can't confirm if that's another Husam Tayeh living in Bridgeview.

(Doc. 218 at 95). And when the CFTC asked Tayeh how he accounted for his income from selling dinar, the following exchange occurred:

> Q. Did you declare any of this income on your federal tax returns for calendar year 2013 and 2014, sir?
>
> A. No. I haven't filed taxes ever.
>
> Q. I'm sorry. I couldn't hear that.
>
> A. That's okay. I'll redact it.

(Doc. 218 at 99). That, of course, is not how redaction works. The Court cannot rely on Tayeh's testimony.

In light of this finding, the Court concludes that the legal issue of whether a disgorgement amount must account for legitimate business expenses is ultimately irrelevant to the disposition of this case. This is so because, even if the law allowed a court to account for a defendant's business expenses when ordering disgorgement, there would need to be evidence of a defendant's expenses before a court could account for them. *See S.E.C. v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004) ("[S]o long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty."); *Blatt,* 583 F.2d at 1335 n.30 ("Typically, disgorgement is *actual profits* plus interest. The problem, however, is that [the defendant] has not provided any information on his

10

actual expenditures, despite having an opportunity to do so at the … hearing." (citation omitted)).

Here, Tayeh failed to provide any credible evidence that would allow the Court to consider reducing the stipulated total gain amount with his legitimate business expenses. As noted above, Tayeh's testimony was not credible. Not to belabor the point, but Tayeh provided only hazy and uncertain estimates of how much he spent on legitimate business transactions.[2] Tayeh testified that he was "not very good at recordkeeping or managing stuff." (Doc. 218 at 78). He claimed to have had multiple employees, but he could not recall filing any employee-employer tax forms and did not testify about how much he paid them. (Doc. 218 at 96). The CFTC introduced evidence that Tayeh personally withdrew millions in cash from bank accounts and direct-transferred millions more to high-end jewelers. (Doc. 218 at 55–57). Tayeh testified that he used this cash and jewelry to trade for Iraqi dinar in Jordan and Vietnamese dong in Hong Kong. (Doc. 218 at 76). But Tayeh provided nothing—no travel records, government documents, shipping receipts, witness testimony, passport stamps, etc.—to corroborate his testimony about using untraceable cash and jewelry to purchase large amounts of currency overseas. The

---

[2] Tayeh's testimony reminds the Court of a classic television character, Colonel Flagg from M*A*S*H: "Nobody can get the truth out of me because even I don't know what it is. I keep myself in a constant state of utter confusion." *M*A*S*H: The Abduction of Margaret Houlihan* (CBS television broadcast October 26, 1976).

Court also notes that Tayeh's estimate of what he spent purchasing currency ($12,800,000) is substantially less than the total of the unexplained cash withdrawals ($3,800,000) and transfers to jewelers ($14,300,000). *Compare* Doc. 218 at 57 *with* Doc. 218 at 80. Tayeh further stated that he had marketing, travel, shipping, payroll, and other operating expenses as well as financial losses. (Doc. 218 at 77). But Tayeh did not offer any concrete numbers to attach to these expenses, only a vague estimate of approximately $2,500,000 in marketing costs. (Doc. 218 at 78, 80). Most importantly, Tayeh never offered evidence about how much, if any, dinar he actually provided to customers who completed installment contracts.

The upshot is that the parties' stipulated amount of total gain is the only figure with any basis in evidence.[3] The Court finds that $22,559,153.85 is the appropriate figure for disgorgement.

## B. Civil Monetary Penalty

In addition to disgorgement, the CFTC is seeking a substantial civil monetary penalty of triple Tayeh's monetary gain: $77,355,000. (Doc. 186 at 18). Tayeh asked that any financial penalties "should be limited by [his] realized actual profits and then further limited by his inability to pay these penalties." (Doc. 218 at 20). Tayeh testified at trail that he was destitute and could not pay a substantial fine.

---

[3] The CFTC filed a motion for the Court to draw an adverse inference based on Defendant's failure to produce business records. Because there is no need to draw an adverse inference against Tayeh, the Court will deny that motion as moot. (Doc. 228).

The Court has discretion to award a "civil monetary penalty in the amount of not more than the greater of $[140,000] or triple the monetary gain to the person for each violation." 7 U.S.C. §13a-1(d)(1) (2012); 17 C.F.R. §143.8(a)(4)(iii)(B) (2016) (raising statutory maximum from $100,000 to $140,000). The Court may "fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent." *C.F.T.C. v. Trimble*, 2013 WL 317576, at *9 (D. Colo. Jan. 28, 2013) (citing *Miller v. C.F.T.C.*, 197 F.3d 1227, 1236 (9th Cir. 1999)).

To determine an appropriate penalty, the Court considers the following factors: the nature of the violation of the Act or Regulations, whether scienter was present, the consequences of the violation, the financial benefits to the defendant, and the harm to customers. *In re Grossfeld*, CFTC No. 89-23, ¶26,921, 1996 WL 35028720 (Dec. 10, 1996) (footnotes omitted), *aff'd*, *Grossfeld v. C.F.T.C.*, 137 F.3d 1300 (11th Cir. 1998). The CFTC and Tayeh disputed how much weight to afford the defendant's ability to pay, or whether the Court should consider the defendant's ability to pay at all.

1. Ability to Pay

Tayeh argues that he is destitute. The CFTC does not dispute that Tayeh's finances are relevant to determining the amount of a penalty. (Doc. 188 at 5). Although the Eleventh Circuit has not directly addressed whether ability to pay should be considered in awarding a penalty, the Circuit has noted that ignoring

ability to pay is not an abuse of discretion. *S.E.C. v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008). Other courts within the Circuit have decided to consider ability to pay: the court "is cognizant of its duty to be realistic and not set a figure which is impossible for a defendant to comply with due to lack of monetary resources." *C.F.T.C. v. Heffernan*, 274 F. Supp. 2d 1375, 1378 (S.D. Ga. 2003) (quoting *C.F.T.C. v. Rosenberg,* 85 F. Supp. 2d 424, 455 (D.N.J. 2000) (internal quotation marks omitted)).

The CFTC makes two arguments that Tayeh's alleged inability to pay a large fine should not prevent the Court from awarding $70,000,000.

First, the CFTC argues that Tayeh waived his inability-to-pay argument by not raising it as an affirmative defense in his pleading under Rule 8(c)(1). Tayeh replied that the CFTC had at least a year of constructive notice when the issue was raised in response to summary judgment. "Failure to plead an affirmative defense generally results in a waiver of that defense." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221–22 (11th Cir. 2012) (quoting *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1239 (11th Cir. 2010)). But when "a plaintiff receives notice of an affirmative defense by some means other than pleadings, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. When there is no prejudice, the trial court does not err by hearing evidence on the issue." *Pensacola*, 684 F.3d 1211, 1222 (quoting *Grant v. Preferred Research, Inc.*, 885

F.2d 795, 797 (11th Cir. 1989)). For example, in *Grant* the court allowed the defendant to raise the affirmative defense of statute of limitations in a motion for summary judgment less than a month before trial. 885 F.2d at 797. The Eleventh Circuit held that the defendant was entitled to judgment as a matter of law based on that defense. *Id.* at 798–99. Here, the CFTC had notice of Tayeh's alleged inability to pay a year before trial. Because the CFTC has not shown it would be prejudiced by allowing the defense, the Court will consider Tayeh's ability to pay.

Second, the CFTC argues that Tayeh has not shown an inability to pay a fine. Indeed, the evidence presented at trial leads the Court to believe that Tayeh has attempted to shelter his assets by giving them to family members. Tayeh represented in an affidavit at summary judgment that he was living "off the generosity of his parents." But when he was asked about his assets at trial, Tayeh said that he controlled extensive real estate. Upon further prompting, Tayeh asserted that he had transferred these assets to his late father's real estate company, which Tayeh manages and from which he draws a salary. The transferred properties include "a bunch of condos and one vacant land," as well as Tayeh's personal residence. (Doc. 218 at 88). Tayeh continued: "[t]hen there was another one. There was a commercial property that has [family] liens on it, too…." Tayeh also transferred a townhouse. In total, Tayeh estimates that he transferred nine properties, with several of them producing rental income. (Doc. 218 at 88–89). Tayeh also noted that he has a

Mercedes, a Ducati motorcycle (which he estimated was worth $3,000), and a Rolex he bought from his brother two months before trial. (Tayeh testified that he purchased the Rolex as a loan to his brother, but that Tayeh borrowed the money from his mother to buy the Rolex.) Pleading indigency because your former assets are now purportedly held by your family is not a convincing argument. The Court finds that Tayeh obviously lacks the assets to pay a fine in the range of $70,000,000, but Tayeh has not shown an inability to pay any fine.

2. Other Factors

The Eleventh Circuit has affirmed a CFTC regulatory judgment that considered the totality of the circumstances, specifically the following factors, to assess a civil monetary penalty: "(1) the relationship of the violation at issue to the regulatory purposes of the Act; (2) respondent's state of mind; (3) the consequences flowing from the violative conduct; and (4) respondent's post-violation conduct." *In re Grossfeld*, CFTC No. 89-23, ¶26,921 (footnotes omitted), *aff'd*, *Grossfeld*, 137 F.3d 1300. The Court will address each of these factors as well.

First, regarding the nature of the violation of the Act or Regulations, the CFTC says defrauding customers violates a core provision of the Commodity Exchange Act and involves some of the most serious conduct because "[f]raud attacks the very core of market integrity and investor confidence in the futures markets." The parties'

arguments center on this quote from a CFTC document as quoted by the Eleventh

Circuit:

> Our gravity determination turns on the synthesis of two distinct
> components. The starting point is an assessment of the abstract or
> general seriousness of each violation at issue. The nature of some
> violations make them generally more serious than other violations. The
> general seriousness of a violation derives primarily from its relationship
> to the various regulatory purposes of the Commodity Exchange Act.
> Conduct that violates core provisions of the Act's regulatory system—
> such as manipulating prices or *defrauding customers should be
> considered very serious* even if there are mitigating facts and
> circumstances.... Once a violation has been generally located on the
> statutory continuum of seriousness, the focus shifts to the particular
> mitigating or aggravating circumstances presented by the unique facts
> of the individual conduct at issue....
>
> Several factors deserve special consideration in analyzing the
> individual culpability of a respondent.... A respondent who makes a
> mistake in the face of an ambiguous statutory duty or in circumstances
> that are unique and unforeseeable is less culpable than a respondent
> who knowingly and repeatedly violates the same provisions in an effort
> to gain a competitive edge.
>
> ... [T]he consequences flowing from the violative conduct should also
> be assessed. *If the respondent benefitted from the violation or if direct
> harm to customers or the market resulted, respondent's violation is
> more serious than those that result only in potential benefit or harm.*
> Moreover, a respondent's post-violation conduct—cooperation with
> authorities, attempts to cure the violation and provide restitution—may
> mitigate the seriousness of the violation."

*JCC, Inc. v. C.F.T.C.*, 63 F.3d 1557, 1571 (11th Cir. 1995) (quoting *In re Premex*,

[1987–1990 Transfer Binder] ¶ 24,165 at 34,890 to 34,891 (footnotes and citations

omitted) (emphasis added)).

Here, Tayeh admitted to defrauding customers, which violates one of the core provisions of the Commodities Exchange Act. But the CFTC did not provide any evidence of actual harm to customers or to the market. In the words of the CFTC's counsel, Tayeh provided his customers with "a poor man's option [contract]," (Doc. 218 at 33), where customers paid a small amount of money up front with the intent to pay future installments if dinar became more valuable. In the criminal case, the United States likewise contended that most of the installment contracts were used by customers as "options" to speculate on dinar. Because dinar never experienced the massive upswing these speculators anticipated, many customers apparently never made additional payments to receive the dinar that Tayeh had promised to provide.

The CFTC argues that Tayeh has inflicted "untold misery" upon thousands of customers. (Doc. 218 at 113). But this "untold misery" is problematic precisely because it remains untold. While some customers came forward in the criminal case, they represented an extremely small percentage of overall transactions. The CFTC provided no additional evidence of customer complaints or harm in this case. Having reviewed the record of the criminal case and the evidence in this case, it appears that most of Tayeh's customers dodged a bullet that they never saw coming.

Second, regarding Tayeh's state of mind, there is no dispute that Tayeh admitted the fraud was intentional and knowing, and that he neither intended to

fulfill all the currency transactions nor to set aside anything more than a small amount of currency.

Third, regarding Tayeh's post-violation conduct, the CFTC says Tayeh has shown lack of respect for the law by violating the Court's statutory restraining order and order freezing Tayeh's assets. Despite these orders, Tayeh cashed customers' cashier checks and money orders totaling $450,198.22. (Doc. 55 at 3). He then turned in this money to the Court. (Doc. 218 at 14). Because Tayeh returned the money, the CFTC withdrew its motions for contempt. (Doc. 84 at 2). This conduct does not strongly favor either party. The parties had a dispute over some of Tayeh's funds, but they eventually resolved the dispute without the aid of the Court.

Finally, the Court has taken judicial notice of the criminal proceedings where Tayeh was sentenced to serve twelve months and one day in prison. There, the United States agreed to recommend a sentence no higher than thirty-six months imprisonment, which was a departure or variance from the Sentencing Guidelines range. *Tayeh*, Case No. 1:16-cr-213-WKW-TFM, at Doc. 11 (Plea Agreement). And the sentencing court granted an even more substantial downward variance. The sentencing court gave the following reasons for varying from the Guidelines: "the government proved no actual loss; defendant has extremely strong family and community ties; defendant is very remorseful; defendant has little or no risk of

recidivism." *Tayeh*, Case No. 1:16-cr-213-WKW-TFM, at Doc. 34 (Statement of Reasons). These findings also favor Tayeh here.

After evaluating these factors, the Court rejects the CFTC's request for a $70,000,000 civil penalty and concludes that imposing an additional penalty of $140,000 on top of the $22,559,153.85 disgorgement award is appropriate. This penalty is the highest per-violation penalty that does not involve tripling the amount of gain. It is comparable to penalties imposed in analogous cases in the Eleventh Circuit. *See C.F.T.C. v. Levy*, 541 F.3d 1102, 1113 (11th Cir. 2008) (affirming $600,000 penalty for "brazen, repeated, and intentional" violations, including targeting insurance money of a mother's recently deceased daughter despite knowing 100% of investors lost money); *C.F.T.C. v. States*, 673 F. Supp. 2d 1320, 1327, 1330 (S.D. Fla. 2009) (awarding $910,000 penalty where "violations of the Act were intentional and directly impacted the numerous victims of this fraud"); *C.F.T.C. v. States*, 674 F. Supp. 2d 1311, 1319 (S.D. Fla. 2009) (awarding $520,000 penalty); *C.F.T.C. v. Hunter Wise Commodities, LLC*, 21 F. Supp. 3d 1317, 1353 (S.D. Fla. 2014) (awarding penalty of triple defendant's profits of $18,481,964.13 for well-thought out scheme to defraud approximately 3,200 customers for unprovided services); *Heffernan*, 274 F. Supp. 2d at 1378–79 (reducing CFTC's requested penalty to $125,000 because of limited assets and unpaid medical bills). The Court finds that, because the CFTC did not prove that Tayeh harmed any

particular consumer, it would be excessive to impose a civil penalty in an amount over $140,000.  The Court finds that a penalty in the amount of $140,000 is appropriate for the magnitude of this offense and enough to act as a deterrent, especially considering the related criminal conviction and substantial disgorgement amount.

## CONCLUSION

Based on the above, Defendants shall pay $22,559,153.85 in disgorgement and $140,000 as a civil penalty.

A final judgment consistent with this Memorandum Opinion will be entered as a separate document.

**DONE** and **ORDERED** this 14th day of February 2020.

 /s/ Andrew L. Brasher
ANDREW L. BRASHER
UNITED STATES DISTRICT JUDGE